UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| BEEPER VIBES, INC., | : | Case No. 3:10-cv-473 |
| | : | |
| Plaintiff, | : | Judge Timothy S. Black |
| | : | |
| vs. | : | |
| | : | |
| SIMON PROPERTY GROUP, INC., *et al.*, | : | |
| | : | |
| Defendants | : | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This civil case is before the Court following a trial to the bench on September 23,

2013.  Following trial, the parties filed proposed Findings of Fact and Conclusions of

Law.  (Docs. 73, 74). [1]  Pursuant to Fed. R. Civ. P. 52, the Court now sets forth and enters

its Findings of Fact and Conclusions of Law.

## I.  FINDINGS OF FACT

1.      Plaintiff and Counterclaim Defendant Beeper Vibes, Inc. ("Beeper Vibes")

entered into the following leases with Counterclaimants:

---

[1]  Following the filing of the proposed Findings of Fact and Conclusions of Law, Defendants
filed a motion to strike Plaintiff's proposed Findings of Fact and Conclusions of Law as
untimely.  (Doc. 75).  Specifically, Defendants argue that pursuant to this Court's September 23,
2013 Order, the parties were to make "simultaneous filing of briefs on or before 10/14/13 at
5:00 p.m."  Plaintiff filed its Findings of Fact and Conclusions of Law on October 14, 2013 at
9:52 p.m., approximately five hours after the deadline.  (Doc. 74).  Plaintiff's counsel maintains
that he did not note in his docketing system the exact time the statement was due.  (Doc. 76 at
¶ 2).  Moreover, he claims that his office was closed for the Columbus Day holiday and he was
not in the office on October 14, 2013.  (*Id.* at ¶ 3).  Counsel maintains that he did not read any
portion of Defendants' trial brief or proposed Findings of Fact and Conclusions of Law before
filing the same, and, therefore, Defendants were not prejudiced by Plaintiff having filed five
hours late.  (*Id.* at ¶ 5).  The Court finds that there is no evidence that Defendants were
prejudiced in any manner by Plaintiff's late filing.  Moreover, this Court seeks to decide cases on
the merits and not procedural defaults.  *See Foman v. Davis*, 371 U.S. 178 (1962).  Accordingly,
Plaintiff's motion to strike (Doc. 75) is **DENIED**.

a.  Beeper Vibes entered into a five-year lease with Boynton-JCP Associates, Ltd. ("Boynton") on or about July 9, 2010 for Kiosk Space No. KI09 in the Boynton Beach Mall in Boynton Beach, Florida.  (JX 1).

b.  Under the Boynton lease, Beeper Vibes was obligated to pay rent in the following amounts:

| Lease Term | Annual Rent | Monthly Rent |
|---|---|---|
| July 2010-June 2011 | $ 64,080.00 | $ 5,340.00 |
| July 2011-June 2012 | $ 66,002.40 | $ 5,500.20 |
| July 2012-June 2013 | $ 67,982.47 | $ 5,665.21 |
| July 2013-June 2014 | $ 70,021.95 | $ 5,835.16 |
| July 2014-June 2015 | $ 72,122.60 | $ 6,010.22 |

(JX 1 at § 3).

c.  Beeper Vibes also entered into a five-year lease with Defendant Coral-CS/Ltd. Associates ("Coral") on or about July 9, 2010 for Kiosk Space No. KI10 in the Coral Square Mall in Coral Springs, Florida.  (JX 2).

d.  Under the Coral lease, Beeper Vibes was obligated to pay rent in the following amounts:

| Lease Term | Annual Rent | Monthly Rent |
|---|---|---|
| July 2010-June 2011 | $ 69,080.00 | $ 5,756.67 |
| July 2011-June 2012 | $ 71,152.40 | $ 5,929.37 |
| July 2012-June 2013 | $ 73,286.97 | $ 6,107.25 |
| July 2013-June 2014 | $ 75,485.58 | $ 6,290.47 |
| July 2014-June 2015 | $ 77,750.15 | $ 6,479.18 |

(JX 2 at § 3).

e. Beeper Vibes also entered into an eleven-month lease with Defendant Keystone-Florida Property Holding Corp. ("Keystone") on or about July 20, 2010 for Kiosk Space No. 8 in the Galleria Fort Lauderdale Mall in Fort Lauderdale, Florida. (JX 3).

f. Under the Keystone lease, Beeper Vibes was obligated to pay rent in the amount of $5,500.00 per month. (JX 3 at 1).

g. Beeper Vibes also entered into a fifteen-month lease with Defendant Sunrise Mills Limited Partnership ("Sunrise") on or about September 16, 2010 for Kiosk Space No. 2011A in the Sawgrass Mills Mall ("Sawgrass") in Sunrise, Florida. (JX 4).

h. Under the first Sunrise lease, Beeper Vibes was obligated to pay rent in the amount of $6,666.67 per month. (JX 4 at 1).

i. Beeper Vibes also entered into another fifteen-month lease with Sunrise on or about September 16, 2010 for Kiosk Space No. 8008 in Sawgrass. (JX 5).

j. Under the second Sunrise lease, Beeper Vibes was obligated to pay rent in the amount of $6,250.00 per month. (JX 5 at 1).

k. Beeper Vibes also entered into a five-year lease with Defendant SDG Dadeland Associates, Inc. ("Dadeland") on or about October 5, 2010 for Kiosk Space No. KI26 in the Dadeland Mall in Miami, Florida. (JX 6).

2. Under the Dadeland lease, Beeper Vibes was obligated to pay rent in the following amounts:

| Lease Term | Annual Rent | Monthly Rent |
|---|---|---|
| November 2010-October 2011 | $80,000.00 | $6,666.67 |
| November 2011-October 2012 | $82,400.00 | $6,866.67 |
| November 2012-October 2013 | $84,872.00 | $7,072.67 |
| November 2013-October 2014 | $87,418.00 | $7,284.83 |
| November 2014-October 2015 | $90,040.70 | $7,503.39 |

(JX 6 at § 3).

3.     None of Beeper Vibes Florida locations operated after November 17, 2010.

(T. 57).

4.     Section 26 of the Boynton, Coral, and Dadeland leases provides that it is an

event of default if the tenant "abandons or vacates or does not do business in the Premises

for ten (10) days."  (JX 1, 2 and 6 at § 26(f)).

5.     Beeper Vibes took possession and commenced operations at each of the

aforementioned locations with the exception of the Dadeland Mall.  As Belvo testified at

trial, although Beeper Vibes extended the occupancy date from October 1, 2010 to

November 1, 2010, the space at Dadeland was not made available on November 1, 2010.[2]

(T. 202).  In fact, as of November 17, 2010, there was still another tenant on Beeper

Vibes' space.[3]  (*Id.*)  Beeper Vibes never paid rent at Dadeland and never took possession

of the space.  (T. 168, 199).

6.     Due to unanticipated competition by Best Buy Mobile, Beeper Vibes's

auditor determined in November 2010 that the Boynton Beach and Coral Springs

[2]  Defendants presented no evidence that this space was ever tendered to Beeper Vibes.

[3]  As Belvo testified, when he sent out the phone company in November 2010 to install Beeper Vibes' phone lines, he was told by the technician that he was "standing here at the kiosk site" and was informed by mall security and mall maintenance that he could not install the phone line as there was "another kiosk on the space."  (T. 202).

locations were overstocked with inventory as compared to other Beeper Vibes locations. (T. 182).  Therefore, the Beeper Vibes' staff was instructed to reallocate some of the inventory at these locations.[4]  (*Id.*)

7.     In regards to the Boynton Beach Mall, Beeper Vibes determined that the location was "severely overstocked" given its poor performance.  (T. 183).  Therefore, on November 17, 2010, Belvo instructed Beeper Vibes' Florida staff to pull certain inventory from the location for reallocation to other stores.[5]  (T. 183-184).  Although Beeper Vibes was current on its rent and other obligations under the terms of the lease, on November 17, 2010, Simon utilized the Boynton Beach Police Department to prevent Beeper Vibes from removing its inventory.  (T. 184-186).  Thereafter, Simon caused this property to be seized and trespassed Beeper Vibes' employees off the property.  (T. 186).

8.     The following day, November 18, 2010, Belvo had a discussion with the manager of Boynton Beach Mall, Mick Grosh, in connection with the return of Beeper Vibes' property.  (T. 184).  During the course of this conversation, Belvo was informed that Simon had a "right" to hold the inventory and equipment that it seized "in order to recover monies" that he believed would be due from Beeper Vibes for a "potential breach of lease."  (T. 185).  After Belvo demanded the return of this property, Grosh informed

---

[4]  As Belvo explained at trial, "[r]eallocation of inventory (was) normal."  (T. 182).  The Florida locations were "heavy on inventory, as compared to other locations in the company" and it was the policy of Beeper Vibes under these circumstances to "go and pull certain inventory out [of the locations] for redistribution or send it back to the home office for redistribution out to other locations."  (T. 183).

[5]  Belvo did not instruct the staff to remove all of the inventory from any of the locations. (T. 192).  Beeper Vibes staff was likewise neither instructed to, nor did it, remove its computers, equipment, or kiosks from the Florida locations.  (T. 192).

him that Beeper Vibes "was not welcome on the premises any longer" and that the "lease was terminated."[6]  (T. 188).

9.      On November 18, 2010, Karen Schubert at Simon emailed Belvo: "Hi Nate.  Please call me to let me know why the two kiosks at Sawgrass have been abandoned.  According to the center, all equipment has been removed."  (DX 6).  Belvo did not respond to this email.

10.      On November 23, 2010, Simon forwarded four letters to Beeper Vibes instructing Beeper Vibes to remove its possessions from Coral Square, the two Sawgrass Mills locations, and the Galleria.[7]  Specifically, Simon sent the following demands:

a.      In connection with Coral Square, Simon's legal collections paralegal, Jerad Childress, forwarded a "Notice to Remove Furnishings," instructing Beeper Vibes to remove its property from the space and advising Beeper Vibes that if the "items in the space are not removed from the premises on or before December 24, 2010, (Simon) will deem the furnishings abandoned and act accordingly."  (PX 39).

b.      In regards to the two Sawgrass Mills locations and the Galleria,

---

[6] Beeper Vibes was not able to recover its possessions from the Boynton Beach Mall for over a month and a half, despite several attempts by Belvo to do so and two letters from counsel for Beeper Vibes demanding their return.  (T. 189; PX 45 and 49).

[7] Simon did not send letters demanding that Beeper Vibes remove its possessions in connection with Boynton and Dadeland, because Simon had seized Beeper Vibes' possessions at Boynton and would not let Beeper Vibes remove them.  With respect to Dadeland, Simon did not tender possession of the space at Dadeland, so there was nothing to remove from the location.

Simon's legal collections paralegal, Tiffany Darden, sent identical letters claiming that in accordance with Section 21 of the leases,[8] which she claimed "outlines the remedies available to (the) landlord in the event of a default by (the) tenant," that Beeper Vibes must remove all "personal property and documents from the premises within ten (10) days."  (PX 40, 41 and 42).

11.     In response to Simon's November 23, 2010 letters, Beeper Vibes gave each of the Defendants written notice that Beeper Vibes' position was that the Defendants had retaken possession of the spaces for their own purposes and that the leases were therefore terminated.  In regards to Galleria, Beeper Vibes likewise gave Defendants notice that it was, in the alternative, terminating the lease upon 60 days' notice in accordance with Section 3 of the lease.  (PX 43, 44, 45, 46, 47, 48 and 49).

12.     Following Defendants' termination of the subject leases, Beeper Vibes was informed by Defendants that the spaces at five malls had not been re-rented.  (T. 142). Finding this hard to believe, Belvo traveled to Florida in March 2011.[9]  (T. 142-143). During the course of this trip and three subsequent visits in December 2011, December 2012, and July 2013, Belvo discovered that Defendants had in fact re-rented each of the spaces.  (T. 142).

---

[8]  The leases for Galleria and the two Sawgrass locations have identical language in connection with the landlord's remedies in the event of a tenant's default.  The remedies are set forth in Section 21 of each lease.

[9]  Prior to this trip, Beeper Vibes did not receive an accounting from Defendants concerning rentals generated by any of the spaces.  (T. 143).

### A.  Coral Square

1.      Prior to Beeper Vibes' occupancy, Kiosk Space KI10 was occupied by another cellular services provider, T-Mobile.  (T. 152).  In fact, Beeper Vibes purchased the actual kiosk utilized by T-Mobile from the mall.  (*Id*.; PX 36). [10]

2.      After the termination of Beeper Vibes' lease, Belvo returned to Coral Square on four occasions.  On each such trip, Belvo walked the mall and determined that no spaces were available for additional tenants. [11]  (T. 162).

3.      When visiting the mall in March 2011, Belvo noticed that a vendor by the name of Payless Fragrances was occupying the space previously occupied by Beeper Vibes. [12]  (T. 154).  Belvo took a picture of this vendor at that time.  (PX 15; T. 154-155).  Belvo likewise noted the existence of and photographed Payless Fragrances on the space in December 2011 and December 2012.  (T. 156; PX 16). [13]

---

[10]  Plaintiff's Exhibit 36 is the copy of the check in the amount of $2,000.00 for the purchase of the kiosk.  (T. 152).

[11]  Specifically, Belvo testified as follows:
   "Q. And why did you walk the malls on those times?

   A. To verify if there was any other spots in the mall where there was power and telephone next to each other in the floor where a prospective person could go.  And that's the same way that I would do it if I went to the mall to look for a space.  I would identify those spaced through the spots on the floor, and then ask the landlords about those spaces. [At Coral Square] there weren't any other spots on the floor with the metal jacks that flipped open that would have telephone or power in them."  (T. 162).

[12]  As with the subsequent tenants at the Boynton Beach Mall, Payless Fragrances was centered on the electrical plug and phone jack utilized by Beeper Vibes.  (T. 155).

[13]  Defendants maintain that the Payless Fragrance kiosk was not in the same location as the Beeper Vibes' kiosk and that Coral had the power capability to supply power to both Payless Fragrance and Beeper Vibes had Beeper Vibes remained in its location.  (Doc. 59 at 23-24).  The evidence does not support this assertion.

4.      During his July 17, 2013 visit to the mall, Belvo noted that a new perfume vendor had taken over the space previously occupied by Payless Fragrances.  (T. 156). This vendor, Lior Perfumes, was likewise centered on the electrical outlet and phone jack utilized by Beeper Vibes during the course of its tenancy.  (T. 157; PX 18).

5.      Beeper Vibes took the perpetuation deposition of the owner and operator of Payless Fragrances, Eitan Peer, on July 26, 2013.  (Doc. 60 at 1).  At his deposition, Mr. Peer testified in relevant part as follows:

a.      Mr. Peer testified that after the termination of Beeper Vibes' lease, Payless Fragrances took over Beeper Vibes former space on July 1, 2011, which had previously been occupied by T-Mobile.  (*Id.* at 21).

b.      When shown a photograph (PX18) of the Lior Perfume kiosk, Peer acknowledged that Lior Perfume had taken over the Payless Fragrances location in July 2013, after Simon had "kicked him out" to make way for Lior who agreed to pay a "few hundred dollars more" for the space.  (*Id*. at 16).

6.      At her perpetuation deposition on July 26, 2013, the mall's manager, Valerie Beaubrun, admitted that Lior Perfume took over the space previously occupied by Payless Fragrances.[14]  (Doc. 59 at 19).

7.      At trial, consistent with the testimony of Beaubrun and Belvo, McMurtray acknowledged that Beeper Vibes took over the space previously occupied by T-Mobile.

---

[14]  Ms. Beaubrun testified that the former location of Beeper Vibes was in a very busy hallway and a very desirable part of the mall given its proximity to the food court.  (Doc. 66 at 29-30). As a result, Simon has been successful in getting tenants in there "all the time."  (*Id*. at 30).

(T. 40). McMurtray further acknowledged that a tenant went into the space previously occupied by Beeper Vibes, but could not recall the identity of the tenant. (T. 41). McMurtray likewise testified that following the termination of Beeper Vibes' lease, another Verizon dealer, Tower Wireless, entered the mall. (T. 45). As Belvo noted during the course of his December 2011 visit to the mall, this Tower Wireless location was directly down the hall from the Beeper Vibes location. (T. 176, PX 17).[15] Given the restrictions of the placement of Verizon kiosks, Beeper Vibes' location and Tower Wireless's location could not have co-existed. (T. 179). However, Tower Wireless did not insist on being in the location it occupied when it was located at Coral. (Doc. 59 at 24). Rather, there were other open spaces where Tower Wireless could have been located. (*Id.* at 24-25). Accordingly, if Beeper Vibes had remained in its location, Coral would have been able to place Beeper Vibes and Tower Wireless in the mall at the same time. (*Id.* at 25).

   **B.    Keystone/Galleria**[16]

   1.    Beeper Vibes paid a $2,000.00 security deposit in connection with the Galleria lease. (T. 167). There is no evidence that the security deposit was ever returned.

   2.    The kiosk utilized by Beeper Vibes at Galleria was owned by the mall. (T. 162). In December 2010, Belvo was asked by the Galleria to return the keys to the kiosk so that they could place a sausage vendor in the space for the holidays. (T. 164). In

---

[15] A copy of a photograph demonstrating the existence of the Tower Wireless kiosk at this location in 2011 is admitted as Plaintiff's Exhibit 17.

[16] Keystone-Florida Property Holding Corporation is the subsidiary of Simon that, in conjunction with Simon, owns and operates the Galleria.

accordance with Galleria's instructions, the keys were returned to the mall on December 7, 2010.  (T. 164).

3.      In March 2011, when Belvo visited the mall, the kiosk was empty but he saw an advertisement for the sausage vendor in the unlocked cabinet.  (T. 166).  As Belvo testified, Beeper Vibes had locked the cabinet on its last day in the mall.  (*Id.*)

## C.      Dadeland

1.      Simon failed to tender possession of the Dadeland kiosk space to Beeper Vibes in accordance with the terms of the lease.

## D.      Sunrise/Sawgrass

1.      In connection with the two locations at the Sawgrass Mall, Defendants acknowledged that subsequent tenants were secured.  In fact, Defendants elected not to proceed on their claim for damages for the alleged breach of the lease concerning Kiosk Space 8008 and entered into a stipulation to this effect.  (Doc. 55 at 25).  In connection with Space 2011A, however, Defendants seek to collect the difference between the amount the vendor "N M Sol Retail, Inc." paid ($5,833.33 per month) and the amount that is due under the lease with Beeper Vibes ($6,66.67 per month).  (PX 8).[17]

2.      Beeper Vibes claims it was improper for the mall to re-let the space to N M Sol Retail for $833.34 less than the amount paid by Beeper Vibes.  Specifically, Beeper Vibes argues that the mall had been "filled to capacity" for the past six years, the rental

---

[17]  Plaintiff's Exhibit 8 is a copy of the January 7, 2011 lease between N M Sol Retail, Inc. and Sawgrass.  During the course of her deposition, Ms. Lenberg authenticated this lease.  (Doc. 55 at 12).  As Ms. Lenberg acknowledged, this space was used by N M Sol Retail as the location to conduct the retail sale of luggage under the trade name "Carry On."  (*Id.*)

rates had not decreased in this six year period, and Defendants failed to present any evidence to demonstrate that it was commercially reasonable to re-let a larger space (135 square feet as opposed to the 100 square feet leased by Beeper Vibes) for over $800.00 less per month.  (Doc. 55 at 10).  However, Defendants presented testimony that a lease involving more square footage does not necessarily lead to a higher rent because there are a number of factors that go into pricing rents.  (*Id.* at 23-24).  The Court agrees.

## II.  CONCLUSIONS OF LAW

1.    Each of the leases at issue is valid and enforceable, and each lease required Beeper Vibes to make monthly rent payments.

2.    Beeper Vibes ceased paying rent before the term of each lease had expired, thus breaching each lease, except Dadeland where Beeper Vibes neither started paying rent nor took possession, and Boynton Beach, where Defendants took possession of the premises before default.

3.    The leases at issue are governed by Florida law, and contracts in Florida are to be given their plain meaning.  *See Dickerson Fla., Inc. v. McPeek* 651 So.2d 186, 187 (Fla. Ct. App. 1995) ("[i]t is axiomatic that where the language of a contract is clear and unambiguous, a trial court is not at liberty to modify the agreement and therefore must give effect to its express provisions.").[18]

---

[18] *Vernon v. Resolution Trust Corp.,* 907 F.2d 1101, 1109 (11th Cir. 1990) ("[u]nder Florida law, when the terms of a contract are unambiguous, the Court is bound to give the language therein its plain and ordinary meaning") (citing *Quesada v. Director, Fed. Emergency Mgmt. Agcy.*, 577 F. Supp. 695, 697 (S.D. Fla. 1983), *aff'd*, 753 F.2d 1011 (11th Cir. 1985)).

4.      When there has been a breach, abandonment, or renunciation of a lease before the expiration of the term, the lessor has three options.  The lessor may: (1) treat the lease as terminated and retake possession for the lessor's purposes; (2) hold possession for the lessee's account, in which case the lessee is responsible for any difference between the rent obligation and amounts the lessor recovers by re-leting the premises; or (3) stand by and do nothing and sue the lessee as each installment of rent matures, or sue for all the rents due when the lease expires.  *See*, *e.g.*, *Wagner v. Rice*, 97 So. 2d 267, 270 (Fla. 1957).

5.       "Where there is a dispute over which of these [*Wagner*] courses the lessor has elected to pursue, the key question, in the absence of an express agreement, is whether, by operation of law, there has been a surrender by the lessee and an acceptance thereof by the lessor in such a manner as to terminate all further liability of the lessee." *Babsdon Co. v. Thrifty Parking Co.*, 149 So. 2d 566, 569 (Fla. App. 1963).

6.      Under Florida law, the Boynton Beach landlord elected to terminate the lease.  No other landlord elected to terminate the leases.  Rather, the landlords acted only to retake possession, exercising the second *Wagner* option as set forth in the following provision of section 26 of the Coral lease:

> "In any [default] event, and without grace period (the same being hereby waived by Tenant), Landlord, in addition to all other rights and remedies it may have, shall have the right thereupon or at any time thereafter to terminate this Lease and shall have the right, either before or after such termination, to re-enter and take possession of the Premises…"

(JX 1, 2, 6 and § 26).

7.   Following Beeper Vibes abandonment of the leased premises at the Galleria, Coral Square, and Sunrise malls, and its refusal to respond to requests by Counterclaimants for information regarding future tenancy, the landlords declared a default under the leases and requested that Beeper Vibes remove any remaining property from the premises.  (PX 39-42).  Beeper Vibes could have, in response to these letters, offered assurances to the landlords that it intended to continue to perform its obligations under the leases.  However, Beeper Vibes opted not to do so.  Since each landlord had the right, under each lease, to retake possession after a default by Beeper Vibes, and since each landlord continued to seek rent from Beeper Vibes, it is clear that Counterclaimants each exercised the second *Wagner* option following Beeper Vibes' defaults.

8.   "If the second [*Wagner*] option is selected, *the leasehold estate remains in existence*, to the extent that the landlord can hold the tenant for damages for the balance of the lease term following the landlord's recovery of possession."  *Hudson Pest Control, Inc. v. Westford Asset Mgmt., Inc.*, 622 So. 2d 546, 549 (Fla. App. 1993) (citing Fla. Jur. 2d *Landlord and Tenant* § 124 (1982)).  "However, the landlord then has a duty to mitigate the tenant's damages by making a good faith effort to release the property at a fair rental.  And, the landlord must credit the tenant for any rents obtained from another tenant, during the lease term."  *Id.*

9.   In response to the landlords' default notices, Beeper Vibes authorized its counsel to send letters purporting to set forth counsel's "understanding" that the landlords were taking possession of the premises and that Beeper Vibes considered the leases to be terminated.  (PX 43-49).  The Keystone, Coral Square, and Sunrise landlords never

agreed with this "understanding" and there is no evidence that these landlords elected to terminate their leases with Beeper Vibes.

> ### A.     Keystone/Galleria

1.     Under section 21 of the Keystone lease, it is an independent event of default if the tenant "shall abandon the Space." (JX 3-5 at § 21). Beeper Vibes abandoned its space in the Keystone Mall.

2.     The Keystone lease gave the landlord immediate rights to possession upon the tenant abandoning the space. (JX 3-5, § 21).

3.     Beeper Vibes asserts that it terminated the Keystone lease in writing on November 24, 2010. (PX 43). However, the evidence demonstrates that Beeper Vibes abandoned the Keystone premises on November 17, 2010, which constituted an event of default under section 21 of the lease. Keystone had already declared a default on November 23, 2010, prior to the letter being sent by Beeper Vibes' counsel. (PX 40). Having defaulted under the lease, Plaintiff could no longer exercise any termination right it might have had prior to its default. "A party to a contract cannot take advantage of his own wrongdoing to avoid responsibility thereunder." *Waters v. Key Colony East, Inc.*, 345 So. 2d 367 (Fla App. 1977).

4.     Accordingly, Defendants are entitled to damages for unpaid rent from December 1, 2010 through June 30, 2011[19] in the amount of $38,500.00 minus the $2,000.00 security deposit, for a total of $36,500.00.[20]

---

[19]  Simon re-leased the space on July 1, 2011.

**B.      Dadeland**

1.      A landlord has the obligation to deliver possession of the demised property to the tenant in accordance with the terms of the lease.  *Harvey Corp. v. Universal Equipment*, 188 Fla. 644 (1947).  The Dadeland lease indicates that Dadeland was required to deliver possession of the premises to Beeper Vibes by October 1, 2010 in accordance with Section 1.  (JX 6).  The parties agreed to extend this deadline until November 1, 2010.

2.      As of November 17, 2010, however, Dadeland had not delivered possession to Beeper Vibes.  In fact, as of this date another tenant still occupied the space.  There is no evidence that Dadeland ever tendered possession of the space to Beeper Vibes.  Even if it had, there is no requirement for Beeper Vibes under either the terms of the lease or Florida law to accept possession of the space at any time after November 1, 2010.

3.      Accordingly, the Court finds that Beeper Vibes did not breach the Dadeland lease.

**C.      Boynton Beach**

1.      Under the Boynton Beach lease, a leasehold is considered an event of default if the tenant "abandons *or* vacates *or* does not do business in the Premises for ten (10) days."  (JX 1, 2 and 6 at § 26(f)) (emphasis added).

2.      The evidence shows that Defendants took possession of the Boynton Beach

---

[20]  Plaintiff claims that there was a sausage vendor in the Keystone space during the 2010-2011 holiday season and therefore Defendants should have mitigated their rent accordingly.  However, there is insufficient evidence of this assertion.

premises before Plaintiff defaulted.  Specifically, Plaintiff did not intend to abandon Boynton Beach on November 17, 2010.  (T. 183-184).  However, Simon utilized the Boynton Beach Police Department to refuse to permit Beeper Vibes to remove a portion of its inventory, caused the property to be seized, and trespassed Beeper Vibes employees off the property.  (T. 186).  Beeper Vibes made an immediate and concerted effort to obtain its property, but was told it "was not welcome on the premises any longer" and that the "lease was terminated."  (T. 188).

       3.    Accordingly, the Court finds that Defendants exercised the first *Wagner* option -- treat the lease as terminated and retake possession exclusively for its own purposes.  (Conclusions of Law at Section II, ¶ 4).  This option results in the landlord's not being able to sue for damages measured by the rent payments which accrue in the future after the landlord has retaken possession.  *Geiger Mut. Agency, Inc. v. Wright*, 233 So. 2d 444 (Fla App. 1970).  The rationale for this result is that the lease has been "surrendered" by either the actions of the parties or their expressed intent.  Since a surrender extinguishes the leasehold estate, all of the tenant's unaccrued or future rent obligations likewise evaporate.  *Hudson Pest Control v. Westford Asset Mgmt.*, 622 So. 2d 546, 549 (Fla. Ct. App. 1993).  Accordingly, since Beeper Vibes was current on the rent at the time Defendants terminated the lease, Beeper Vibes owes nothing on the Boynton Beach lease.

      **D.    Coral Square**

       1.    Beeper Vibes defaulted on the Coral Lease by abandoning the space.

2.      Section 26 of the Coral lease expressly allows the landlord, before terminating the lease, to re-enter and take possession of the premises, a remedy akin to the second *Wagner* option.  Accordingly, Counterclaimant held possession of the leasehold for Beeper Vibes' account and thus is permitted to recover the unpaid lease, less any rents received from replacement tenants.

3.      Having exercised the second *Wagner* option, Counterclaimants were required to "mitigate the tenant's damages by making a good faith effort to release the property at a fair rental.  And, the landlord must credit the tenant for any rents obtained from another tenant, during the lease term." *Hudson Pest Control*, 622 So. 2d at 549.

4.      The Court finds that Simon should have credited Beeper Vibes for rents obtained from Payless Fragrances.  (T. 154).  Beeper Vibes presented evidence that Payless Fragrances occupied its space in the mall from July 1, 2011 to June 30, 2013. (Doc. 60 at 7, 8; PX19, 20).  Payless paid rent of $40,794.00 from July 1, 2011-June 30, 2012 and another $40,794.00 from July 1, 2012-June 30, 2012.  (*Id*.)[21]  Despite Defendants claim to the contrary, the evidence supports a finding that during this timeframe, there was no other space in the mall where Payless Fragrances would have had access to a telephone line or power outlet required to operate.

5.      Accordingly, the Court finds that the landlord could not have collected

---

[21]  In making calculations, Defendants gave credit for the lease to Lior Perfume, because it occupied the same space as Beeper Vibes.  (T. 94).  Specifically, Lior Perfumes took over the Beeper Vibes space in July 2013, providing for $114,358.95 in mitigating rents.  (T. 74-77; DX 13-14).

rents both from the temporary tenant and from Beeper Vibes had Beeper Vibes remained at its kiosk location.  (*See* Findings of Fact at Section I.A., ¶¶ 2-6).  Therefore, these rents constitute "rents obtained from another tenant, during the lease term," for the spaces vacated by Beeper Vibes.  *See Hudson Pest Control, Inc.*, 622 So. 2d at 549.

6.     The Court finds that Tower Wireless would not have prevented Beeper Vibes from maintaining its lease because there were other spaces where Tower Wireless could have been located which would not have violated the restrictions of the placement of Verizon kiosks.  (T. 179; Doc. 59 at 24).

7.     Accordingly, Defendants are entitled to damages in the amount of $141,549.41.[22]

**D.     Sunrise/Sawgrass**

1.     Under section 21 of the Sunrise lease, it is an independent event of default if the tenant "shall abandon the Space."  (JX 3-5 at § 21).

2.      The Sunrise lease gave the landlord immediate rights to possession upon the tenant abandoning the space.  (JX 3-5, § 21).

3.     Beeper Vibes defaulted on the Sunrise lease by abandoning the space. Sunrise is thus entitled to exercise the "hold possession" option in *Wagner* and is entitled to recover rents that were due following the breach of the lease.

4.     The evidence demonstrates that Sunrise found new tenants for kiosk 2011A

---

[22] Defendants maintain that they are owed $223,137.41 on the Coral lease.  However, with the mitigation of the Payless Fragrances' lease (two years x $40,794.00), the total damage amount is $141,549.41.

after Beeper Vibes abandoned the space.  Beeper Vibes questioned the failure of Sunrise to obtain an equal amount of rent for the space, but a lease involving more square footage does not necessarily lead to a higher rent.  (Findings of Fact at Section I.D, ¶ 2).[23]

5.    Accordingly, Defendants are entitled to damages in the amount of $18,635.08.

## III.  CONCLUSION

Based on all of the foregoing, it is the judgment of the Court that Counterclaimants are entitled to judgment in their favor and against Beeper Vibes as follows:[24]

1.    For the Coral lease, judgment in the amount of $141,549.41;

2.    For the Keystone lease, judgment in the amount of $36,500.00; and

3.    For the Sunrise lease, judgment in the amount of $18,635.08.

Motions for attorney fees, if any, with supporting affidavits and evidence, must be filed within 45 days from the entry of these Findings of Fact and Conclusions of Law. *See* S.D. Ohio Civ. R. 54.2.  Motions for taxation of costs, if any, shall be filed within 14 days from the entry of these Findings of Fact and Conclusions of Law.  S.D. Ohio Civ. R. 54.1.

---

[23]   MN Sol Retail (Carry On) took over the Beeper Vibes space in January 2011, providing for $68,031.63 in mitigating rents.  (T. 82-83; DX 21).

[24]   Beeper Vibes read into the record portions of the Counterclaim in an attempt to hold Counterclaimants to different damage amounts than those presented at trial.  However, a party is not limited to a damages request or calculation set forth in a pleading.  "[T]he court may award whatever relief is proper under the facts of the case and is not limited by the prayer for relief or the language of the complaint."  *Interdigital Tech. Corp. v. OKI Am. Inc.*, 845 F. Supp. 276, 282 (E.D. Pa. 1994) (citing 3 James W. Moore, et al., Moore's Federal Practice at ¶¶ 8-14, (2d Ed. 1993)).

The Clerk shall enter judgment accordingly pursuant to Rule 58 of the Federal

Rules of Civil Procedure.

**IT IS SO ORDERED**.


Date:  11/5/13                                    *s/ Timothy S. Black*
                                                 Timothy S. Black
                                                 United States District Judge